IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 3, 2024

## IN RE BOBBY B. ET AL.

**Appeal from the Juvenile Court for Greene County**
**No. 17355, 17356    Kenneth N. Bailey, Jr., Judge**

———————————————————

**No. E2024-00730-COA-R3-PT**

———————————————————

In this termination of parental rights case, Appellant/Mother appeals the trial court's termination of her parental rights to the minor children on the grounds of: (1) abandonment by failure to visit and failure to support, Tenn. Code Ann. § 36-1-113(g)(1); (2) persistent conditions, Tenn. Code Ann. § 36-1-113(g)(3); and (3) failure to manifest an ability and willingness to assume custody of the children, Tenn. Code Ann. § 36-1-113(g)(14). Because there is clear and convincing evidence to support the grounds relied on by the trial court and its determination that termination of Appellant's parental rights is in the children's best interests, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed and Remanded**

KENNY ARMSTRONG, J., delivered the opinion of the court, in which ANDY D. BENNETT and KRISTI M. DAVIS, JJ., joined.

Cody T. Knight, Greeneville, Tennessee, for the appellant, Devin B.[1]

Jonathan Skrmetti, Attorney General and Reporter, and Jason R. Trautwein, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

D. Jeannine Dalton, Greeneville, Tennessee, Guardian ad Litem.[2]

---

[1] In cases involving minor children, it is the policy of this Court to redact the parties' names to protect their identities.

[2] The Guardian Ad Litem filed a notice adopting the Tennessee Department of Children's Services brief.

# OPINION

## I. Background

In May 2020, Devin B. ("Mother") and Robert I. ("Father") were living in a camper in Greeneville, Tennessee with their three children: (1) Bobby B. (d/o/b January 2017); (2) Cole B. (d/o/b January 2017); and (3) Justus B. (d/o/b May 2018). On May 7, 2020, while Cole and Bobby were left alone in the camper, it caught fire. Tragically, Cole died, and Bobby sustained severe third-degree burns and bodily injuries. That day, the Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court of Greene County, Tennessee (the "trial court") alleging that Bobby and Justus (together, the "Children") were dependent and neglected. At that time, the trial court entered an ex parte order removing the Children from Mother and Father's custody and placing them in the custody of DCS. A Guardian Ad Litem ("GAL") was appointed for the Children. On October 6, 2020, the Children were adjudicated dependent and neglected and ordered to remain in DCS' custody. Father's parental rights were subsequently terminated, and he is not a party to this appeal.

On September 9, 2021, the trial court ratified the Family Permanency Plan (the "Plan"). Relevant to Mother, the Plan required that she: (1) obtain a legal source of income to support the Children and provide proof of income to DCS; (2) obtain safe and stable housing and allow DCS and the GAL to make announced and unannounced visits to monitor the housing; (3) resolve her legal issues, remain compliant with probation, and refrain from accruing new charges; (4) submit to random drug screens and continue to comply with the alcohol and drug treatment plan; (5) complete a mental health intake and follow recommendations; (6) complete a parenting assessment and follow recommendations; and (7) follow all court orders regarding visitation, including submitting to random drug screens. As discussed below, over the course of several years, Mother made little progress with the Plan. During the pendency of this case, Mother lived in Tennessee, Arkansas, and Missouri and was incarcerated for a portion of the time in Arkansas and Tennessee.

On August 2, 2023, DCS filed a petition to terminate Mother's parental rights to the Children. As grounds for termination, DCS alleged that: (1) Mother abandoned the Children by failing to visit them; (2) Mother abandoned the Children by failing to support them; (3) persistent conditions existed; and (4) Mother failed to manifest an ability and willingness to assume custody of the Children. DCS also alleged that termination was in the Children's best interest. From our review, it does not appear that Mother filed an answer to the petition.

On April 23, 2024, the trial court heard the petition to terminate Mother's parental rights. The following witnesses testified: (1) Mother; (2) Rebecca D., foster mother ("Foster Mother"); and (3) Jennifer Osteen, the DCS case manager. Mother was

represented by counsel, and the Children's GAL was also present. That day, the trial court made extensive oral findings of facts and conclusions of law before terminating Mother's parental rights. By order entered May 7, 2024, the trial court found that there was clear and convincing evidence to terminate Mother's parental rights on the grounds of: (1) abandonment by failure to visit and failure to support the Children; (2) persistent conditions; and (3) failure to manifest an ability and willingness to assume custody of the Children. The trial court also found by clear and convincing evidence that it was in the Children's best interest to terminate Mother's parental rights. Mother filed a timely appeal.

## II. Issues

As stated in her appellate brief, Mother's sole issue on appeal is: "Was the trial court proper in finding that grounds for termination of parental rights were proven by clear and convincing evidence?"

Although Mother does not challenge the trial court's finding that termination of her parental rights is in the Children's best interest, the Tennessee Supreme Court has instructed this Court to review same. *See In re Carrington H.*, 483 S.W.3d 507, 535 (Tenn. 2016). Accordingly, in addition to the grounds for termination of Mother's parental rights, we will also review the trial court's finding that termination of her rights is in the Children's best interests.

## III. Standard of Review

The Tennessee Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d at 522-23 (footnote omitted). In Tennessee, termination

of parental rights is governed by statute, which identifies "'situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). Thus, a party seeking to terminate a parent's rights must prove: (1) the existence of one of the statutory grounds; and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination of parental rights cases, appellate courts review a trial court's factual findings *de novo* and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H*., 483 S.W.3d at 523-24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re A.M.H*., 215 S.W.3d 793, 809 (Tenn. 2007)). The Tennessee Supreme Court has explained that:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re [A.M.H.]*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E*., 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

## IV. Grounds for Termination

Although only one ground must be proven by clear and convincing evidence, the Tennessee Supreme Court has held that "appellate courts must review a trial court's

findings regarding all grounds for termination and whether termination is in a child's best interest, even if a parent fails to challenge these findings on appeal." ***Id.*** at 511. Accordingly, we first review the trial court's findings as to each ground for termination.

### 1. Abandonment

We begin with the trial court's conclusion that Mother abandoned the Children. Under Tennessee Code Annotated section 36-1-113(g)(1),[3] a parent's parental rights may be terminated when the parent abandons the child as defined in Tennessee Code Annotated section 36-1-102. Relevant here, section 36-1-102(1)(A) provides:

> For purposes of terminating the parental . . . rights of a parent . . . to that child . . . "abandonment" means that:
>
> > (i)(*a*) If the child is four (4) years of age or more, for a period of four (4) consecutive months immediately preceding the filing of a . . . petition . . . to terminate the parental rights of the parent . . . of the child who is the subject of the petition for termination of parental rights . . . ***the parent . . . [has] failed to visit or [has] failed to support or [has] failed to make reasonable payments toward the support of the child***;

Tenn. Code Ann. § 36-1-102(1)(A)(i)(*a*) (emphasis added). DCS filed the petition to terminate Mother's parental rights on August 2, 2023. Accordingly, the relevant four-month time period is from April 1, 2023 through August 1, 2023. The statute also provides that "[a]bandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental . . . rights . . . ." Tenn. Code Ann. § 36-1-102(1)(F). However, the statute provides for an affirmative defense to abandonment where the parent's failure to visit or failure to support was not willful. Tenn. Code Ann. § 36-1-102(1)(I). The parent bears the burden of proof at trial to prove that such failure was not willful, and such defense must be established by a preponderance of the evidence. Tenn. Code Ann. § 36-1-102(1)(I). Here, the trial court concluded that Mother abandoned the Children by both failing to visit and failing to support them. We turn to review both grounds.

### a. Failure to Visit the Children

Tennessee Code Annotated section 36-1-102(1)(E) provides that a "failure to visit" consists of "the failure, for [the period of four consecutive months immediately preceding the filing of the petition to terminate the parental rights of the parent], to visit or engage in

---

[3] The versions of the statutes referenced in this opinion were in effect when DCS filed its petition to terminate Mother's parental rights.

more than token visitation." Tenn. Code Ann. § 36-1-102(1)(E). The statute defines "token visitation" as "visitation, under the circumstances . . . [that] constitutes nothing more than perfunctory visitation or visitation of such infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C). "That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant time period[.]" Tenn. Code Ann. § 36-1-102(1)(E).

In the order terminating Mother's parental rights, the trial court found that "there were no visits between [M]other and the [C]hildren," in the four months before DCS filed the termination petition, and that Mother last saw the Children in October 2020. The record support these findings. Indeed, during her testimony, Mother admitted that she had not seen the Children since October 2020. Ms. Osteen testified that DCS lost contact with Mother in March 2023 despite multiple attempts to contact her. Mother testified that her last contact with DCS was either in March or May 2023. As proof of DCS' efforts, Ms. Osteen testified that she contacted Mother's probation officer, who reported that he did not know Mother's whereabouts. Ms. Osteen also testified that she called Mother's mother, who stated that she would try to have Mother return Ms. Osteen's call, but Ms. Osteen never heard from Mother.

Mother's appellate brief fails to make a cogent argument concerning abandonment for failure to visit. Mother alleges that she "did not visit for four months, but she was not allowed to visit without having completed drug screens." Although it is unclear, we deduce that Mother admits that she did not visit the Children for the four months preceding the filing of the termination petition. Mother then makes several sparse arguments without specifying a time frame for same, and it appears that many of these arguments concerned Mother's actions several months and/or years before the filing of the petition to terminate her parental rights. On review, Mother does not specifically argue that, from April 1, 2023 through August 1, 2023, she attempted to visit the Children.

We note that, immediately before the conclusion in her appellate brief, Mother states: "It is [Mother's] position that the evidence produced at trial was incompatible with the findings made by the trial court in that [Mother] did not willfully fail to visit the [C]hildren[.]" The defense that a parent's failure to visit was not willful is an *affirmative* defense and one that must be pled in an answer to a petition to terminate parental rights. Tenn. Code Ann. § 36-1-102(1)(I). As discussed above, it is unclear whether Mother filed an answer to the petition to terminate her parental rights. An answer does not appear in our appellate record, and Mother's appellate brief makes no mention of one, leading this Court to conclude that one was not filed. Furthermore, had Mother pleaded such affirmative defense, it was her burden at trial to prove same. Tenn. Code Ann. § 36-1-102(1)(I). On review of the trial transcript, it does not appear that Mother's counsel ever made such argument at trial. Indeed, the word "willful" appears only once in the entire trial transcript when the attorney for DCS discussed that the statute required Mother's

failure to visit to be willful. Indeed, Mother cannot now raise this affirmative defense in the conclusion of her appellate brief. *See **In re Imerald W.***, No. W2019-00490-COA-R3-PT, 2020 WL 504991, at \*4 n.5 (Tenn. Ct. App. Jan. 31, 2020) ("Mother failed to file a response to the Petition. Accordingly, because the record contains no pleading by Mother that raises lack of willfulness as an affirmative defense, and because Mother raised no such defense at trial, we conclude that Mother waived this issue.").

The foregoing notwithstanding, to the extent Mother argues that she was prevented from seeing the Children because she was required to complete a drug screen before doing so, such requirement does not preclude a finding of willfulness. Indeed,

>  "[t]his Court has often held that when a parent's visitation has been suspended by the trial court and the parent has the ability to demonstrate a change in situation or behavior that would warrant reinstating visitation but fails to do so, that parent can be found to have willfully failed to visit." [***In re Kiara C.***, No. E2013-02066-COA-R3-PT, 2014 WL 2993845, at \*6 (Tenn. Ct. App. June 30, 2014)] (citing ***In re Elijah B.***, E2010-00387-COA-R3-PT, 2010 WL 5549229, at \*8 (Tenn. Ct. App. Dec. 29, 2010)). Furthermore, this Court has specifically opined that when a parent chooses not to cooperate with certain conditions, such as obtaining a drug and alcohol abuse assessment, that choice "in refusing to cooperate [ ] constitute[s] a willful decision" to discontinue visitation. ***State Dept. of Children's Servs. v. J.A.H.***, [No. E2005-00860-COA-R3-PT], 2005 WL 3543419, at \*6 (Tenn. Ct. App. Dec. 28, 2005).

***In re Jaylah W.***, 486 S.W.3d 537, 551-52 (Tenn. Ct. App. 2015). From the record, we affirm the trial court's conclusion that there is clear and convincing evidence that Mother abandoned the Children by failing to visit them.

### b. Failure to Support the Children

Tennessee Code Annotated section 36-1-102(1)(D) provides that a "failure to support" or failure "to make reasonable payments toward [a] child's support" consists of "the failure, for [the period of four consecutive months immediately preceding the filing of the petition to terminate the parental rights of the parent], to provide monetary support or the failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). The statute defines "token support" as "support [that], under the circumstances . . ., is insignificant given the parent's means." Tenn. Code Ann. § 36-1-102(1)(B). "That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant time period[.]" Tenn. Code Ann. § 36-1-102(1)(D).

The trial court found that Mother "made no child support payments, no money was

sent to DCS, [and] no supplies were sent to DCS for the foster parents to benefit the [C]hildren." The record supports these findings. Mother testified that she was made aware early in the case that she was required to pay child support. However, she testified that she could not provide child support at that time because she was incarcerated and unable to work. According to Mother's testimony, she did not attempt to pay child support "until just recently," but, when she contacted the child support agency, they had no record of her. Ms. Osteen corroborated Mother's testimony that the child support agency had no record of Mother but testified that, under the Plan, the burden was on Mother to open an account with the agency. The record also shows that, in the dependency and neglect order, entered October 26, 2020, Mother was instructed to contact the child support office to "provide [her] current contact information and schedule an appointment for calculation of child support payments as soon as is reasonably possible."

Although Mother was incarcerated during much of this case, she was released from incarceration in August 2022. For several months, including from April 1, 2023 through August 1, 2023, *i.e.,* the four months preceding the filing of the petition to terminate her parental rights, Mother was not incarcerated and reported having some employment during a portion of this time. Still, Mother did not provide support. Although Mother testified that she sent the Children gifts through Angel Tree, a charity, she admitted that she never sent clothing or money during the time the Children were in foster care.

Similar to her argument concerning abandonment by failure to visit, in her appellate brief, Mother briefly argues that she "did not willfully fail to provide" for the Children. As discussed above, Mother waived this argument by failing to file an answer to the petition to terminate her parental rights and by failing to raise such defense at trial. *See **In re Imerald W.**,* 2020 WL 504991, at *4 n.5. Given the foregoing, we affirm the trial court's conclusion that there is clear and convincing evidence that Mother abandoned the Children by failing to support them.

### 2. Persistent Conditions[4]

The trial court also terminated Mother's parental rights under Tennessee Code Annotated section 36-1-113(g)(3), the ground commonly referred to as "persistence of conditions." *See **In re Audrey S.**,* 182 S.W.3d 838, 871 (Tenn. Ct. App. 2005). This ground applies where

> [t]he child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any

---

[4] In her appellate brief, Mother's entire argument concerning the persistent conditions ground is:

> In regard to the assertion that persistent conditions exist that would prevent the safe return of children to parent, [Mother] testified that she had a plan in place to reintegrate and that she asked for mental health and alcohol and drug assistance.

- 8 -

stage of proceedings in which a child is alleged to be a dependent and neglected child, and:

> (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent . . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
>
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and
>
> (iii) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3)(A). The statute further provides that "[t]he six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard." Tenn. Code Ann. § 36-1-113(g)(3)(B).

By order of October 26, 2020, the Children were adjudicated dependent and neglected. The record shows that the Children had been removed from Mother's care for a few years when the trial court heard the termination petition. When the Children were removed from Mother's home, the family was living in a small camper, had a history with DCS, and both Mother and Father had a history of drug dependency. In the order terminating Mother's parental rights, the trial court found that "the conditions which led to removal were [an] unstable living arrangement and the drug related issues with [M]other," and that these conditions persisted. These findings are supported by the evidence. Mother testified that she relapsed a few months before the petition to terminate her parental rights was filed, *i.e.,* around the time she ceased contact with DCS. There was also evidence concerning Mother's recent arrest for methamphetamine-related charges two months after DCS filed the petition to terminate her parental rights. Specifically, the record shows that, on October 20, 2023, Mother was arrested for, *inter alia*, possession of 526 grams of methamphetamine, possession of a weapon by a convicted felon, and other drug-related charges. Additionally, because Mother had outstanding criminal charges against her in Arkansas and Missouri, Mother was arrested for being a fugitive from justice for charges in another state. Specifically, the record shows that, in January 2023, Mother received a felony charge for tampering with a motor vehicle in Missouri. In March 2023, Mother failed to appear for her court date, and a warrant was issued for her arrest. In April 2023, a probation violation was filed in Arkansas. Subsequently, an order suspending her probation was filed and an arrest warrant issued. At the time of the termination hearing,

- 9 -

Mother was incarcerated in Sullivan County, Tennessee on the foregoing drug and fugitive-from-justice charges and awaiting sentencing for same. Mother testified that, after serving time in Sullivan County, Tennessee, she would be extradited to Arkansas and Missouri to answer the charges against her in those states. Mother testified that she believed her legal issues would resolve in one year, and she asked that the Children remain in foster care during that time. The record shows that Mother's recent felony charges in Sullivan County, Tennessee carry a minimum eight (8) year sentence. Nevertheless, Mother believes that she will be released from incarceration in one year and receive credit on her Arkansas and Missouri charges for time served in Tennessee.

Persistence of conditions focuses "on the **results** of the parent's efforts at improvement rather than the mere fact that he or she had made them." *In re Audrey S.*, 182 S.W.3d at 874 (emphasis added). The ground also questions whether the child could be returned to the parent in the near future. *Id.* Indeed, the question here is what is "the likelihood that the child can be safely returned to the custody of [the parent], not whether the child can safely remain in foster care[.]" *In re K.A.H.*, No. M1999-02079-COA-R3-CV, 2000 WL 1006959, at *5 (Tenn. Ct. App. July 21, 2000). The evidence demonstrates that, not only do the conditions that led to the Children's removal persist, *i.e.,* Mother's drug use and an unstable living arrangement, but there is little likelihood that these conditions could be remedied at an early date so that the Children could be returned safely to Mother's care. Mother must answer for the felony charges pending against her in Sullivan County, Tennessee as well as the charges in Arkansas and Missouri before she would be free from the threat of incarceration. Even assuming that Mother is released from incarceration in one year, Mother must also achieve lasting sobriety, secure housing, and secure employment, *i.e.,* stability, before the Children could be returned to her. At the time of the hearing on the petition to terminate Mother's parental rights, the Children had been in foster care for almost four years. While the Children could remain in foster care for another year or more, as discussed above, the question is whether the Children could be returned safely to Mother's care in *the near future*. *In re K.A.H.*, 2000 WL 1006959, at *5. We agree with the trial court that the answer to this question is "No." As discussed further below, the Children have lived with the same foster family for the entire custodial episode. The record shows that the foster parents provide a safe, stable, and loving home for the Children and intend to adopt them if Mother's parental rights are terminated. Indeed, continuing Mother's relationship with the Children would greatly diminish the Children's chances of a safe, stable, and permanent home. Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). Accordingly, we affirm the trial court's conclusion that DCS met its burden to prove persistent conditions.

### 3. Failure to Manifest an Ability and Willingness to Assume Custody of the Children[5]

---

[5] In her appellate brief, Mother makes no argument concerning this ground.

The trial court found, by clear and convincing evidence, that Mother's parental rights should be terminated under Tennessee Code Annotated section 36-1-113(g)(14), which provides for termination when

[a] parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14). This ground requires DCS to establish two separate elements by clear and convincing evidence. *In re Maya R*., No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018) (citation omitted). First, that Mother "failed to manifest 'an ability and willingness to personally assume legal and physical custody or financial responsibility of the [C]hild[ren].'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)). Second, that placing the Children in Mother's legal and physical custody would "pose a risk of substantial harm to the physical or psychological welfare of the [C]hild[ren]." *Id.* We examine each element below.

Concerning the first prong of this ground, the Tennessee Supreme Court has concluded that "the expressed legislative intent for section 36-1-113(g)(14) is to require clear and convincing proof that a parent or legal guardian was either unable or unwilling to personally assume legal and physical custody or financial responsibility of a child." *In re Neveah M.*, No. M2019-00313-SC-R11-PT, 2020 WL 7258044, at *14 (Tenn. Dec. 10, 2020) (emphasis in original). Accordingly, "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *13 (Tenn. Ct. App. June 20, 2018)) (emphasis in original). When determining whether a parent has demonstrated an ability to assume custody, courts focus on a parent's lifestyle and circumstances. *In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at *5 (Tenn. Ct. App. Oct. 26, 2018) (citing *In re Maya R.*, 2018 WL 1629930, at *7; *In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *7 (Tenn. Ct. App. Dec. 27, 2017)). "When evaluating willingness, we look for more than mere words." *In re Jonathan M.*, 2018 WL 5310750, at *5. "Parents must have demonstrated their willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *Id.* For many of the reasons discussed above, Mother failed to demonstrate either an ability or a willingness to assume legal and physical custody or financial responsibility for her Children. At the time of trial, Mother "was incarcerated, unemployed, and homeless, with only a possibility of a better future." *Id.* at *6. Although Mother has professed that she desires to assume custody of the Children, her actions prove otherwise. As discussed at length above, and as the trial court

- 11 -

found, Mother abandoned the Children by failing to visit and failing to support them. Furthermore, she has continued with her criminal activity and drug abuse; these decisions have resulted in the possibility of an eight-year prison sentence for the felony criminal charges pending against her. At the time of trial, Mother clearly lacked both the willingness and ability to assume custody of the Children or to be financially responsible for them. Tenn. Code Ann. § 36-1-113(g)(14). *See **In re Amynn K.**, 2018 WL 3058280, at *15 ("We recognize that Father has repeatedly verbalized his willingness to assume custody of the Child. However, Father's actions, including his continued criminal activity and his failure to financially support the Child, raise doubt as to Father's actual willingness to assume custody or financial responsibility for the Child."). For these reasons, we agree with the trial court that DCS met its burden as to the first prong in the analysis.

As discussed above, the second prong of the analysis required DCS to prove, by clear and convincing evidence, that placing the Children in Mother's "legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the [C]hild[ren]." Tenn. Code Ann. § 36-1-113(g)(14). Regarding what constitutes "substantial harm," we have explained that

> [t]he courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

**In re Maya R.**, 2018 WL 1629930, at *8 (quoting **Ray v. Ray**, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). The trial court found that DCS met its burden to show that returning the Children to Mother would pose a risk of substantial harm to them, and the record supports these findings. Regarding physical harm, Bobby has significant, continuing physical-health concerns due to her severe burns. The record shows that the foster parents have not only navigated Bobby's many surgeries and interventions, but they have also advocated for her to receive the best treatments available. This Court shares in the trial court's concern that Mother would be unable to properly care for Bobby's extensive injuries if the child was returned to her care. Concerning psychological harm, both Children have been diagnosed with post-traumatic stress disorder ("PTSD") due to the trauma of the fire and losing a sibling in it. The record shows that the Children have been in therapy and that the foster parents are helping the Children work through their PTSD issues. The record further shows that the Children have been with their foster parents, their schools, their community, and their extended foster family for four years, and that the Children feel safe and secure with their foster parents. At this point in the proceedings, Mother is essentially a stranger to the Children. The Children were two and three years old when they last visited with

Mother; at the time of trial, Justus was almost six, and Bobby was seven years old. Ms. Osteen testified that Justus does not recognize Mother, and Bobby is fearful of returning to her. Ms. Osteen further testified that she was concerned that returning the Children to Mother would hinder the progress they have made both physically and mentally. This Court shares in Ms. Osteen's concerns. Given Mother's history in this case, and the instability in her life, it is unlikely that she would be able to manage the Children's extensive physical and psychological needs. Notwithstanding the foregoing, "[w]e have previously held that returning [a] child to a virtual stranger meets the substantial harm threshold." *In re Aniyah W.*, No. W2021-01369-COA-R3-PT, 2023 WL 2294084, at \*10 (Tenn. Ct. App. Mar. 1, 2023) (citing *In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at \*6 (Tenn. Ct. App. Jan. 29, 2021); *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at \*17 (Tenn. Ct. App. July 22, 2020)). Indeed, the record shows that the Children are bonded with their foster family and share no relationship with Mother. To remove the Children from the secure and stable environment they know would inevitably cause them substantial harm. From the record, we affirm the trial court's conclusion that Mother's parental rights should be terminated for failure to manifest an ability and willingness to assume custody of the Children. We now turn to the best interests analysis.

## V. Best Interests

When at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest. *In re Bernard T.*, 319 S.W.3d at 606 (citing *In re Adoption of A.M.H.*, 215 S.W.3d at 809).

As the Tennessee Supreme Court explained:

Facts considered in the best interest analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, [455 S.W.3d 533, 555 (Tenn. 2015)] (citing *In re Audrey S*., [182 S.W.3d at 861]). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S*., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d)(2017).

- 13 -

*In re Gabriella D*., 531 S.W.3d 662, 681-82 (Tenn. 2017).

The Tennessee Legislature has directed that, when determining whether termination of parental rights is in a child's best interest, the court "shall consider all relevant and child-centered factors applicable to the particular case[.]" Tenn. Code Ann. § 36-1-113(i)(1). As is relevant to this appeal, these factors include, but are not limited to, the following:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol,

controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

\*\*\*

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

\*\*\*

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). The Legislature has also directed that, when considering the foregoing factors, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2). This Court has noted that "this list [of factors] is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude that terminating a parent's rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005), *perm. app. denied* (Tenn. Nov. 21, 2005). Depending on the circumstances of an individual case, the consideration of a single factor or other facts outside the enumerated, statutory factors may dictate the outcome of the best interest analysis. *In re Audrey S*., 182 S.W.3d at 877. As this Court explained:

Ascertaining a child's best interests . . . does not call for a rote examination of each of Tenn. Code Ann. § 36-1-113(i)'s . . . factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 1994).

The trial court made extensive findings of fact and conclusions of law concerning the above best interest factors and found, by clear and convincing evidence, that each factor weighed in favor of terminating Mother's parental rights. Specifically, the trial court found that the Children require stability and continuity of care given their extensive physical and emotional needs, and that the Children have received such permanency with the foster parents over the last four years. Tenn. Code Ann. § 36-1-113(i)(1)(A). The trial court further found that Mother has not demonstrated any ability to create and maintain a home to meet the Children's basic and specific needs. Tenn. Code Ann. § 36-1-113(i)(1)(Q). Specifically, the trial court cited Mother's transient lifestyle as well as her multiple incarcerations. Similarly, the trial court found that Mother's incarceration, drug abuse, and mental health issues prohibit her from providing for the Children's basic material, educational, housing, and safety needs. Tenn. Code Ann. § 36-1-113(i)(1)(C). The trial court also found that, in the past, Mother failed to provide stability for the Children at issue in this appeal and for her other children, some of whom have been removed from her care. Tenn. Code Ann. § 36-1-113(i)(1)(O). Indeed, the trial court found that "[M]other has shown no ability to meet the needs of the [C]hildren" as evidenced by Mother's lack of "understanding about what Bobby's needs are and how to treat her special needs." Tenn. Code Ann. § 36-1-113(i)(1)(P). Similarly, the trial court acknowledged the significant financial impact of Bobby's treatment and care and found that Mother has failed to provide any support for same. Tenn. Code Ann. § 36-1-113(i)(1)(S).

As discussed above, the trial court found that Mother's instability was due to her incarceration, drug abuse, and unaddressed mental-health issues. Although Mother made some progress early in the case with the Plan and the services DCS offered, *see* Tenn. Code Ann. § 36-1-113(i)(1)(L), the trial court found that Mother ceased contact with DCS. The trial court also found that Mother refused to use community resources offered to her to assist her in changing her circumstances, Tenn. Code Ann. § 36-1-113(i)(1)(K), and that Mother has failed to make a lasting adjustment in her life. Tenn. Code Ann. § 36-1-113(i)(1)(J). Specifically, the trial court found that Mother "has made no effort to live a crime free life and provide a safe and stable home for [the] [C]hildren" as evidenced by the pending criminal charges against her in Tennessee, Missouri, and Arkansas. Furthermore, the trial court found that the Tennessee charges involve drugs and that "[d]rugs have been

- 16 -

a repeating issue throughout [] [M]other's life as she testified that she has been struggling with methamphetamine use since she was 14 years old." Indeed, the trial court found that Mother "has failed to address her [underlying] emotional and mental health needs," and that she has not completed a mental health assessment or counseling. Tenn. Code Ann. § 36-1-113(i)(1)(T). Although Mother testified that she attended some counseling while incarcerated, the trial court noted that there was no proof regarding what she had accomplished during such time.

The trial court found that "there is no secure healthy parental attachment between [M]other and the [C]hildren." Tenn. Code Ann. § 36-1-113(i)(1)(D). Rather, the trial court found that severe trauma surrounds the Children's relationship with Mother. Tenn. Code Ann. § 36-1-113(i)(1)(F). Specifically, the trial court found that "the [C]hildren have significant PTSD exhibited through night terrors among other things[.]" The trial court found that "reunification with [] [M]other could cause significant regressions in [the Children's] progress." Tenn. Code Ann. § 36-1-113(i)(1)(G). The lack of a parental relationship is further compounded by Mother's failure to visit the Children in the three-and-a-half years before the termination hearing. Tenn. Code Ann. § 36-1-113(i)(1)(E). Although the Children have no relationship with Mother, the trial court found that they "have a significant and loving attachment with the foster parents . . . who have provided them a safe and stable home since they were removed." Tenn. Code Ann. § 36-1-113(i)(1)(H). Beyond an attachment to the foster parents, the trial court found that the Children also "have a significant relationship with the extended family members of the foster parents, as well as friends at school and friends of the foster parents." Tenn. Code Ann. § 36-1-113(i)(1)(I). Because the Children are bonded with their foster parents and their extended family and friends, the trial court found that "changing caregivers in this case would have a detrimental effect on the physical and psychological wellbeing of the [C]hildren." Tenn. Code Ann. § 36-1-113(i)(1)(B). The trial court also found that changing caregivers would be detrimental to Bobby's physical health as the foster parents "are trained to look for infection and understand how to treat her burns and what is required to maintain her medical needs."

The record supports the trial court's findings. As the trial court found, Mother's legal issues and resulting instability stem from her struggles with methamphetamine. At trial, Mother admitted that she has been a methamphetamine addict since she was 14 years old. Although there was a significant period when Mother was not using, she admitted that she was using methamphetamine at the beginning of her pregnancies with both Children and that she relapsed as recently as four months before the filing of the termination petition. Mother further testified:

> I have struggled with sobriety and specifically with [m]ethamphetamine. I have just recently discovered that mental health wise it is really imperative for me to seek that out because of the trauma I have endured. I am just as much a victim as my children are. We have all suffered trauma from this. I

- 17 -

am currently on medication for Post Traumatic Stress Disorder and I am on an anxiety medication. The jail can only do so much for me. When I get out I am really going to dive deep into what mental health can do to try to help me figure out why I crave and why I continue to relapse.

While this Court shares in the trial court's hope that Mother will address her underlying mental health issues, trauma, and drug addiction once released from incarceration, the record shows that Mother was provided resources to help her with these issues four years ago when the Children were taken into DCS custody. In her testimony, Mother admitted that she did not take advantage of such services, stating that she was "embarrassed and disappointed in [her]self for not seeking out the right kind of resources and opportunities that would have strengthened [her] ability to comply with [the] reunification plan[.]" Despite her testimony, Mother admitted that she relapsed because she felt that there was a lack of resources provided to her and that she felt defeated after "doing everything [she] was supposed to do." Such contradictory testimony exemplifies the fact that Mother has yet to take full responsibility for her actions, which have prevented the return of the Children to her custody.

Mother acknowledged that her current incarceration prevented the Children from being returned to her, and she agreed that it was in the Children's best interest to temporarily remain with their foster family who provide the Children with a "solid foundation." However, Mother testified that she believed that the Children could be returned to her in one year. Mother's belief is not reality, and her assertion that the Children could be returned to her within one year belies the tasks that lie ahead of her, namely: a steady income, a safe and permanent living arrangement, and lasting sobriety. During the entire custodial episode, Mother has been given time and resources to make these lasting adjustments, but she has failed to do so. For example, Mother was released from her Arkansas incarceration in August 2022. During this time, Mother was in contact with DCS concerning the Plan and steps she would need to take to be able to visit the Children. By January 2023 Mother received a felony charge in Missouri, which led to an order suspending her probation and an arrest warrant in Arkansas. Mother ceased contact with DCS, and, a few months later, she was arrested in Tennessee on more felony charges. In short, Mother was given the opportunity to create a new life for herself and the Children but did not do so.

The record shows that the foster family has been the only solid foundation the Children have ever had. As discussed at length above, Bobby has extensive physical impairments, and both Children suffer from PTSD and emotional trauma. The record shows that the foster parents have provided the support necessary to help the Children. Testimony from Ms. Osteen and Foster Mother demonstrates that the Children feel safe and secure with their foster family; they identify the foster parents as "Mom" and "Dad," and they have developed loving bonds with their foster parents and their extended family and friends. That relationship is reciprocated as Foster Mother testified that she and her

husband would file to adopt the Children if Mother's parental rights were terminated. By contrast, the Children have no relationship with Mother and, as Ms. Osteen testified, they are fearful of returning to Mother's care. Furthermore, because Mother has been absent from the Children's lives over the past four years, she has no understanding of the physical and emotional care and support the Children require. Indeed, the overwhelming evidence supports the trial court's conclusion that termination of Mother's parental rights is in the Children's best interests.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's termination of Mother's parental rights. The case is remanded for such further proceedings as may be necessary and are consistent with this opinion. Costs of the appeal are assessed against the Appellant, Devin B. Because Devin B. is proceeding *in forma pauperis* in this appeal, execution for costs may issue if necessary.

_s/ Kenny Armstrong_
KENNY ARMSTRONG, JUDGE
